**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

|  |  |
|---|---|
| **ANDREA BOCELLI,** | |
| **Plaintiff** | |
| **v.** | **Civil Action No. _____** |
| **PRIVATE JET SERVICES GROUP, LLC,** | |
| **Defendant.** | |

**COMPLAINT**

Plaintiff Andrea Bocelli, by and through his undersigned counsel, hereby files this Complaint against Private Jet Services Group, LLC, stating as follows:

**Preliminary Statement of the Case**

1.      This action arises from the unfair and deceptive acts of Private Jet Services Group, LLC ("PJS"), based in Seabrook, New Hampshire, in inducing Andrea Bocelli to enter an agreement for private jet services based on a misleading proposal to meet Mr. Bocelli's requirements for chartered flight services in connection with several legs of his United States concert tour schedule.  In advance of those concert dates, PJS invoiced Mr. Bocelli a total of around $569,800 for the scheduled flights, which as per PJS' invoice and payment instructions, Mr. Bocelli paid in full.   Having induced Mr. Bocelli to enter the agreement based on misrepresentations about the type of jet it would furnish, PJS pulled a bait-and-switch, providing Mr. Bocelli with a jet that PJS knew was meaningfully unacceptable to him.  Then, PJS improperly and abruptly cancelled flights in the midst of Mr. Bocelli's tightly-scheduled concert tour, forcing

1

him to scramble to secure jet replacement during a very busy period of air travel to maintain his inflexible concert schedule.

2.     PJS not only breached its contractual obligations to Mr. Bocelli, its conduct ran afoul of various enumerated provisions of New Hampshire's Consumer Protection Act, N.H. R.S.A § 358-A:2, as well as the broad prohibition against unfair or deceptive acts or practices within the conduct of trade or commerce in this state.

3.     Mr. Bocelli brings this Action to recover his damages for PJS's wrongful conduct, including, but not limited to, recoupment of the amounts paid to PJS for flight services it failed to provide and the significant costs that Mr. Bocelli incurred to secure replacement flights at short notice, as well as for the vexation and distress caused by PJS's conduct.  Further, Mr. Bocelli is entitled to multiple damages under the Consumer Protection Act in view of PJS's willful and knowing misrepresentations of the services it would provide to Mr. Bocelli.

**The Parties**

4.     Andrea Bocelli is domiciled in Italy.

5.     Private Jet Service Group, LLC (again, "PJS") is a Delaware limited liability company with a principal place of business located at 5 Batchelder Road, Seabrook, New Hampshire 03874.

**Jurisdiction and Venue**

6.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a)(2), as this is an action between a citizen of a foreign state and a citizen of the United States, and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

#15379540v1

7.      Venue in this judicial district is appropriate under 28 U.S.C. § 1391(a)(1), because this is the judicial district in which PJS resides.  Further, the parties have agreed to jurisdiction and venue in this Court.

## The Facts

### A.      The Parties' Negotiations Regarding Private Jet Services

8.      Andrea Bocelli is a world-renowned Italian operatic tenor.

9.      Mr. Bocelli is blind and has heightened hearing sensitivity not only because of his blindness but also because of his musical training and chosen profession. He is also not a very keen flyer, as he has fear of flying and can feel anxiety related to safety issues during air travel. In particular, he is sensitive to the elevated noise that an older airplane tends to make in flight, with such elevated noise causing him more anxiety.

10.      In order to mitigate this sensitivity and anxiety during air travel, when a chartered jet is booked for Mr. Bocelli's concert tours, the jet service provider is initially given a document entitled "Private Jet Specifications & On-Board Rider" (hereinafter, "Artist's Jet Rider").

11.      The Artist's Jet Rider sets forth Mr. Bocelli's requirements for jet service, including specifications as to acceptable model and year of manufacture of the booked jets, as well as specifications for on-board services in order to ensure optimal air travel conditions for Mr. Bocelli, provide an acceptable level of safety for him and his family, and minimize the stress he has to undergo in his concert tours.

12.      Morever, every time a jet is booked for Mr. Bocelli's tours, every jet charter operator is instructed that the commander of every flight should not make any on-board announcements about weather conditions and should make no mention of air turbulence during the flight, all to avoid causing undue anxiety to Mr. Bocelli.

#15379540v1

13.     The Artist Jet Rider and specific instructions, among other things, are always communicated to every private jet service provider Plaintiff contracts with to ensure that the standards for his air travel are clear and understood by the jet service provider before a private jet charter is finalized and signed.

14.     PJS is in the business of arranging and facilitating private jet travel for its clients with licensed direct air carriers.  PJS's client base includes entertainers, and it advertises itself as successful in "providing customized aviation solutions to big players in the entertainment industry" with respect to "live entertaining touring."  https://www.pjsgroup.com/live-entertainment-tours/.

15.     On its webpage describing its "live entertainment touring," PJS declares:

> From strategically planning a 180-day worldwide tour, to dispatching aircraft for one-time events, our expertise delivers customized aviation solutions for every client. Regardless of the scope or size of the project, PJS will create a comprehensive program that responds to specific needs and bespoke requirements.

https://www.pjsgroup.com/live-entertainment-tours/ (emphasis added).

16.     In July 2021, the international booking agent for Mr. Bocelli, Klassics Music Management ("KMM"), contacted PJS to discuss whether it might handle the arrangements for private jet services that Mr. Bocelli would require to perform scheduled concert dates in the United States during November and December 2021.

17.     After an introductory telephone call between representatives of KMM and PJS on or around July 21, 2021, KMM sent an email to PJS providing, among other information, the Artist's Jet Rider. Furthermore, KMM specifically requested in the email that PJS provide additional information regarding additional costs, the year of jet manufacture, and whether the aircraft would be pet-friendly.

#15379540v1

18.     The specific jets required by Mr. Bocelli as set forth in the Artist's Jet Rider for long-haul flights are a Dassault Falcon 7X and Falcon 8X or, for flights under 4 or 5 hours, a Dassault Falcon 900 EX or EX Easy, and the Falcon 2000LX.

19.     Furthermore, the Artist's Jet Rider states specifically, among other things, the following as a requirement for booking: "Please note that any jet model proposed ideally should not be "older" than 4 years (year of manufacture applies)." The reason for this specification was explained to PJS as being based on Mr. Bocelli's jet flying experience, and that an older jet would typically make a more distinctive and elevated noise. Moreover, based on Mr. Bocelli's own personal safety requirement, a newer jet would not only make less noise, but also would provide a higher standard of safety in air travel and lessen the impact of stress brought on by long hours of air travel, especially when he is on a gruelling tour schedule.

20.     During the parties' ensuing negotiations and calls for private jet services, KMM repeatedly emphasized to PJS that the specific model and year of the jets required by Mr. Bocelli were particularly important to him, in light of his blindness and heightened sensitivities to airplane noise during air travel.

21.     In an initial proposal for services furnished by PJS's Chief Executive Officer, Greg Raiff, to KMM in late August 2021, PJS only identified one of the specific jets required by Mr. Bocelli, causing KMM to question the accuracy of PJS's initial proposal as being not in line with the discussions.

22.     In response to KMM's inquiry about PJS's initial proposal, on or about August 26, 2021, Mr. Raiff acknowledged in an email that he had attached the wrong proposal, which was not in in accordance with what was discussed, and subsequently provided a revised proposal (the "PJS Proposal").

#15379540v1

23.     Regarding the PJS Proposal, Mr. Raiff stated:

> Attached here please find the correct proposal for the Andrea Bocelli November-December 2021 Tour including pictures and details of the Falcon 2000LX that will be utilized for the US (short flights only) portion of the tour, and the Falcon 7X, which will be used for only the transatlantic flights….The 7X aircraft offers seating for fourteen passengers with eight Captain's Chairs and two three-seat Divans in the aft cabin as required by the rider. The Falcon 2000LX is a nine-seat heavy jet. This aircraft comes equipped with six Captain's Chairs and a three-seat Divan.  The Falcon 2000LX went through a full refurbishment last year and also offers complimentary domestic Wifi.

24.     Indeed, accompanying the PJS Proposal, Mr. Raiff provided KMM with photographs depicting the two types of referenced jets — the Falcon2000LX and Falcon 7X — that were required by Mr. Bocelli, bolstering Mr. Raiff's written assurance that PJS would provide these particular jets for Mr. Bocelli should he agree to engage PJS's air charter services.

25.     Although PJS subsequently sent several proposals of different kinds of jets, including a Falcon 2000EX, KMM underlined and verified several times during the exchange of communication between PJS and KMM certain specific details about the Falcon 2000LX, thus indicating the preferred choice of aircraft for Mr. Bocelli's flights.

26.     The Falcon 2000LX is a newer aircraft than the Falcon 2000, and accommodates more passengers than the Falcon 2000.

27.     Through calls and emails, KMM made clear to PJS the importance to Mr. Bocelli of his specifications for the newer aircraft to seat more passengers and accommodate the amount of luggage needed to be brought by Mr Bocelli and his family.

28.     Having been assured by PJS throughout the negotiation discussions and emails, and subsequently in the PJS Proposal that PJS would provide the jets specified by Mr. Bocelli,  on or about September 6, 2021, KMM notified PJS that Mr. Bocelli would engage its services as set

#15379540v1

forth in the PJS Proposal, and requested that PJS provide billing details and a contract to confirm the deal.

**B.     The Air Charter Services Blanket Purchase Agreement**

29.     An account manager at PJS responded to KMM's request for a contract reflecting the PJS Proposal to which Mr. Bocelli agreed, and sent KMM an Air Charter Services Blanket Purchase Agreement ("Agreement") on or about September 6, 2021.

30.     As to the booking of aircraft, the Agreement provides that PJS would provide a proposal that Mr. Bocelli "must acknowledge acceptance of the terms" thereof "in writing or electronically to complete the reservation."  Agreement p. 1.

31.     PJS also provided KMM a Statement of Work ("SOW") on September 23, 2021, reflecting a total charter price of $569,800 for 15 flights on certain dates in November and December 2021.

32.     Mr. Bocelli had, through KMM, accepted the terms of the PJS Proposal.

33.     Mr. Bocelli executed the Agreement on or about September 27, 2021.

34.     Mr. Bocelli timely paid the $569,800 to PJS.

35.     The SOW was not expressly incorporated into the Agreement, but PJS directed Mr. Bocelli to sign it, which he did on or about September 27, 2021, understanding that it was consistent with the PJS Proposal.

36.     The SOW excluded, however, the terms of the PJS Proposal that identified the specific jets required by Mr. Bocelli and that PJS promised to utilize.  Instead, the SOW presented an itinerary for Mr. Bocelli's travel in the form of 11-column table of information condensed into approximately a quarter of one page, with small print that stated, among other things, an aircraft type to which the parties had not agreed — the Falcon 2000, rather than the Falcon 2000LX.

#15379540v1

**C.      PJS Breaches the Parties' Agreement and Reveals Its Misrepresentation**

37.      On or around December 2, 2021, during the short-haul flight from Santa Ana, CA, to Cleveland, OH, which was the fourth leg of the flight arranged for him by PJS as part of his US concert tour, Mr. Bocelli understood and expected that he would be flying on a Falcon 2000LX aircraft, as set forth in the PJS Proposal.  PJS provided, however, a substantially older Falcon 2000 (1996 Year of Manufacture) with too few seats.

38.      After completing the short-haul flight, Mr. Bocelli's wife immediately emailed KMM that the jet provided by PJS during the flight from Santa Ana, CA, to Cleveland, OH, did not correspond to the one proposed by PJS and did not meet the specifications indicated in the Artist's Jet Rider because of the following reasons:

     a.  First, the jet was old (1996 Year of Manufacture) and had too few seats and would not be able accommodate the other members of the family in the next short-haul leg of the flight.

     b.  Second, although PJS had been instructed, as indicated in the Artist's Jet Rider, to ensure that the whole flight crew is briefed not to make any on-board announcements regarding adverse weather conditions, flight turbulence, or general flight safety to the Artist and the jet party, the flight attendant and the pilot announced during the flight that they should expect a very bumpy ride before landing.

     c.  Third and most importantly, Mr. Bocelli had noted and sensed during the flight that the jet made so much noise as to alert him that he was on an old jet and not the jet he thought he had contracted and paid for, and this personal observation, coupled with the fact of having to go through the announced turbulence on an older plane,

caused him to be anxious and to fear for his safety during the last 20 minutes of the flight.

39.     In sum, PJS did not provide the jet and service that PJS had contracted to deliver and that Mr. Bocelli had already paid for.

40.     KMM complained to PJS on Mr. Bocelli's behalf, and PJS apologized for their oversight and the flight crew's mistake regarding the on-board flight announcement, and acknowledged that the aircraft provided (a 1996 Falcon 2000) did not meet Mr. Bocelli's requirements, and also acknowledged that it was likely unable to provide the required aircraft identified in the PJS Proposal.

41.     On or around December 4, 2021, an executive account manager at PJS, Ken Taplin, notified KMM that PJS was "working hard to try to find a replacement option for the next 5 tour dates and we have not found many newer model Falcons available for these dates."

42.     PJS had made false representations to Mr. Bocelli, or representations in reckless disregard for the truth, when it promised that Falcon 2000LX jets "will be used" for short-haul flights.  In actuality, PJS was either unable or unwilling to provide Mr. Bocelli with use of the Falcon 2000LX, and never so informed him until he complained about the Falcon 2000 that had been provided to him instead of the Falcon 2000LX that PJS had stated "will be used."

43.     On or about December 5, 2021, Mr. Taplin unilaterally and abruptly cancelled the Falcon 2000 jet that PJS had arranged for Mr. Bocelli's domestic travel, leaving him without air transportation arrangements for his imminent concert tour dates.

44.     PJS refused to provide Mr. Bocelli with a refund for the flights that it unilaterally cancelled for which Mr. Bocelli had already paid.

#15379540v1

45.     PJS's cancellation of the flights it had arranged for Mr. Bocelli without his instruction or agreement to do so, and refusal to refund his payment for those flights, were breaches of the Agreement.

46.     PJS's improper cancellation of Mr. Bocelli's domestic flights not only caused him unnecessary amount of stress during an already gruelling concert tour but also required him to quickly charter new flights with another company, costing him in excess of $300,000 and put his already scheduled show at the risk of being cancelled if he could not secure a substitute domestic flight.

47.     Moreover, because of the improper cancellation by PJS, Mr. Bocelli had to contend with a substitute jet that did not have proper heating, thus causing Mr. Bocelli to suffer from the cold brought on by the high-altitude flight, and further putting him at risk of catching a cold or flu, which would have impacted his ability to perform during his concert tour.

48.     PJS's improper cancellation of Mr. Bocelli's domestic flights caused further anxiety to Mr. Bocelli because the remaining booked flight with PJS—a return trip from Miami, FL, to Pisa, Italy, at the end of the concert tour—was likewise unilaterally cancelled by PJS.

49.     KMM had subsequently confirmed from the actual jet operator (Air Hamburg) that this leg of the flight, although already paid for by Mr Bocelli to PJS, had not been confirmed and paid by PJS to the actual jet operator.

## Count I
## Breach of Contract

50.     Mr. Bocelli incorporates by reference and realleges the allegations set forth in the foregoing paragraphs as if fully set forth herein.

51.     Mr. Bocelli and PJS agreed that PJS would, among other things, provide for Mr. Bocelli's use of a Falcon 2000LX jet for flights within the domestic United States.

#15379540v1

52.     PJS committed breach of contract by failing to provide Mr. Bocelli with use of the Falcon 2000LX, as promised.

53.     PJS committed further breach of contract by cancelling Mr. Bocelli's flights.  None of the contractual bases for cancellation of flights set forth in the Agreement's Standard Terms and Conditions were applicable.  Furthermore, PJS had no right to retain payments made by Mr. Bocelli for the flights it had cancelled.

54.     As a direct, proximate, and actual result of PJS's breaches of contract, Mr. Bocelli has incurred substantial monetary damages, including having to book substitute flights and pay more for them because PJS had subsequently cancelled the booked and previously paid flights..

55.     Pursuant to Paragraph 17 of the Standard Terms and Conditions of Services appended to and incorporated into the parties' Agreement, Mr. Bocelli is entitled to an award of his reasonable attorneys' fees and costs of this lawsuit.

**Count II**
**<u>Breach of Implied Covenant of Good Faith and Fair Dealing</u>**

56.     Mr. Bocelli incorporates by reference and realleges the allegations set forth in the foregoing paragraphs as if fully set forth herein.

57.     The Agreement is a contract subject to the implied duty of good faith and fair dealing.

58.     PJS has violated various duties of good faith and fair dealing implied in the Agreement.

59.     *First*, in every contract formed under New Hampshire law, there is an implied duty of good faith and fair dealing with respect to contract formation and negotiations. *See Centronics Corp. v. Genicom Corp.*, 132 N.H. 133, 139 (1989).

#15379540v1

60.     PJS breached this implied duty of good faith and fair dealing here by inducing Mr. Bocelli to enter the Agreement based on the PSJ Proposal, which set forth a representation and promise that PJS would provide the Falcon 2000LX for the domestic flights in his upcoming concert tour.

61.     It was abundantly clear in the parties' negotiations that Mr. Bocelli required use of the Falcon 2000LX for the domestic flights in his upcoming concert tour.

62.     The promise and assurance by PSJ that it would provide Mr. Bocelli with the use of Falcon 2000LX jets were negotiation tactics deployed without due regard for its obligation to follow-through on them.

63.     By its conduct, PSJ demonstrated that its promises rang hollow and that it paid no attention to them once Mr. Bocelli had agreed to move forward with the execution of PJS's standard contract for air charter services.

64.     By this wrongful conduct PSJ breached the covenant of good faith and fair dealing implied in the Agreement.

65.     Upon information and belief, PSJ further breached the covenant of good faith and fair dealing when it abruptly cancelled Mr. Bocelli's flights at a time when it knew it would be extremely difficult for Mr. Bocelli to secure alternative flights consistent with his need.

66.     *Second*, every contract formed in New Hampshire has an "implied-in-fact duty of cooperation" when necessary for one party to achieve what has been promised to them under the agreement.  *Great Lakes Aircraft Co., Inc. v. City of Claremont*, 135 N.H. 270, 294 (1992).  This duty relates to the "parties' fundamental expectations underlying the express agreement.  When the fundamental expectations of a party are hindered, and the act of one contracting party can restore the expectation, [the Court] will imply a duty to act."  *Id.*

#15379540v1

67.     Here, a fundamental expectation of the Agreement was that, among other things, PSJ would provide jet services on certain days in certain locations, so that Mr. Bocelli could maintain his exacting concert tour schedule.

68.     After Mr. Bocelli complained about PSJ's provision of a Falcon 2000 jet instead of the Falcon 2000 LX jet that it had assured Mr. Bocelli would be provided, PJS unilaterally cancelled Mr. Bocelli's upcoming flights, thereby breaching its duty of cooperation and preventing Mr. Bocelli from obtaining a fundamental expectation of the Agreement that certain jet services would be provided.

69.     *Third*, all contracts contain an implied obligation of good faith imposed on a defendant who has been afforded discretion under the contract "tantamount to a power to deprive the plaintiff of as substantial portion of the agreement's value," in which case, such discretion must be exercised reasonably, in light of the common purposes of the contract and the plaintiff's reasonable expectations, "and in furtherance of . . . community standards of honesty, decency and reasonableness . . . ." *Centronics Corp*, 132 N.H. at 144.

70.     To the extent that PJS was afforded any discretion under the Agreement, for example in terms of cancellation of flights, it exercised that discretion unreasonably and contrary to community standards of honesty, decency, and reasonableness.

71.     A common purpose of the Agreement and Mr. Bocelli's reasonable expectations was for PJS to provide certain jet services.

72.     PJS deprived Mr. Bocelli of a substantial portion of the Agreement's value when it cancelled scheduled flights.

73.     As a direct and proximate result of PJS's breaches of its implied duty of good faith and fair dealing, Mr. Bocelli has suffered substantial monetary damages.

#15379540v1

## Count III
## Promissory Estoppel

74.     Mr. Bocelli incorporates by reference and realleges the allegations set forth in the foregoing paragraphs as if fully set forth herein.

75.     PJS promised Mr. Bocelli that it would provide him with the use of a Falcon 2000LX for the US domestic flights in his concert tour.  PJS's Chief Executive Officer, Greg Raiff made this promise to Mr. Bocelli expressly in the PJS Proposal.

76.     In justifiable and reasonable reliance on PJS's promise, Mr. Bocelli agreed to engage PJS's services, and paid PJS $569,800 in advance therefor.

77.     PJS reneged on its promise to provide Mr. Bocelli with use of the Falcon 2000LX. Further, PJS cancelled jet services that it promised it would provide to Mr. Bocelli in December 2021, and upon which he had reasonably relied to his detriment, having paid PSJ in advance for those cancelled flights.

78.     Under these circumstances, it would be unconscionable for PJS to retain Mr. Bocelli's payment for the flight services that it promised, but failed, to provide to him.

## Count IV
## Intentional Misrepresentation

79.     Mr. Bocelli incorporates by reference and realleges the allegations set forth in the foregoing paragraphs as if fully set forth herein.

80.     PJS has held itself out as being responsive "to specific needs and bespoke requirements" of musicians seeking private jet services for live entertainment tours.

81.     Mr. Bocelli made clear to PJS that he would not engage it to provide chartered jet services unless it could provide him with specific jets and services.  Mr. Bocelli's Artist's Rider and subsequent communication between PJS and KMM set forth his requirements for specific jets

and services, and when PJS's initial proposal did not mirror those requirements, Mr. Bocelli's agent, KMM, inquired about the accuracy of the proposal.

82.     In response, PJS's Chief Executive Officer, Mr. Raiff, provided an amended proposal, referred to as the "correct proposal" for Mr. Bocelli's consideration (the PJS Proposal), stating unequivocally that the Falcon 2000LX "will be utilized for the US (short flights only) portion of the tour," as Mr. Bocelli had required.  Mr. Raiff provided a photograph depicting a Falcon 2000LX with the PJS Proposal, intending to instill confidence in Mr. Bocelli that PJS would meet his requirements for chartered domestic air travel.

83.     PJS's representations that the Falcon 2000LX "will be utilized" were material to Mr. Bocelli and PJS was aware of the materiality of those representations to Mr. Bocelli.

84.     PJS's representations that the Falcon 2000LX "will be utilized" were not true.

85.     PJS's representations that the Falcon 2000LX "will be utilized" were made, upon information and belief, with knowledge of their falsity or with conscious indifference to the truth of these statements.

86.     PJS subsequently acknowledged in its communications with KMM that it had not arranged for use of the Falcon 2000LX and that such jet craft was not available.

87.     PJS's representations to Mr. Bocelli that the Falcon 2000LX "will be utilized" were intended to cause him to rely on the representation.

88.     Mr. Bocelli reasonably relied on PJS's representations that the Falcon 2000LX "will be utilized" for the domestic portion of his United States tour, in agreeing to engage PJS for such services.

89.     As a direct, proximate, and actual result of PJS's intentional misrepresentations, Mr. Bocelli has incurred substantial monetary damages.

90.     Mr. Bocelli is also entitled to enhanced compensatory damages, including for vexation and distress caused by PJS's aforementioned conduct.

## Count V
## Negligent Misrepresentation

91.     Mr. Bocelli incorporates by reference and realleges the allegations set forth in the foregoing paragraphs as if fully set forth herein.

92.     PJS has held itself out as being responsive "to specific needs and bespoke requirements" of musicians seeking private jet services for live entertainment tours.

93.     Mr. Bocelli made clear to PJS that he would not engage it to provide chartered jet services unless it could provide him with specific jets and services.  Mr. Bocelli's Artist's Rider and subsequent communication between PJS and KMM set forth his requirements for specific jets and services, and when PJS's initial proposal did not mirror those requirements, Mr. Bocelli's agent, KMM, inquired about the accuracy of the proposal.

94.     In response, PJS's Chief Executive Officer, Mr. Raiff, provided an amended proposal, referred to as the "correct proposal" for Mr. Bocelli's consideration (the PJS Proposal), stating unequivocally that the Falcon 2000LX "will be utilized for the US (short flights only) portion of the tour," as Mr. Bocelli had required.  Mr. Raiff provided a photograph depicting a Falcon 2000LX with the PJS Proposal, intending to instill confidence in Mr. Bocelli that PJS would meet his requirements for chartered domestic air travel.

95.     PJS's representations that the Falcon 2000LX "will be utilized" were not true.

96.     PJS's representations that the Falcon 2000LX "will be utilized" were material to Mr. Bocelli and PJS was aware of the materiality of those representations to Mr. Bocelli.

#15379540v1

97.     It is the "duty of one who volunteers information to another not having equal knowledge, with the intention that he will act upon it, to exercise reasonable care to verify the truth of his statements before making them." *Patch v. Arsenault*, 139 N.H. 313, 319 (1995).

98.     PJS breached its duty of reasonable care owed to Mr. Bocelli in making representations to him that the Falcon 2000LX "will be utilized" without exercising reasonable care to verify the truth of such statements before making them.

99.     Mr. Bocelli reasonably relied on PJS's representations that the Falcon 2000LX "will be utilized" for the domestic portion of his United States tour, in agreeing to engage PJS for such services.

100.    As a direct, proximate, and actual result of PJS's negligent misrepresentations, Mr. Bocelli has incurred substantial monetary damages.

101.    Mr. Bocelli is also entitled to enhanced compensatory damages, including for vexation and distress caused by PJS's aforementioned conduct.

## Count VI
## Violation of NH RSA 358-A

102.    Mr. Bocelli incorporates by reference and realleges the allegations set forth in the foregoing paragraphs as if fully set forth herein.

103.    PJS is a "person" within the meaning of RSA 358-A:1, I.

104.    PJS has violated enumerated prohibitions of RSA 358-A:2, including by:

a.     "Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services" in violation of RSA 358-A:2, II.

#15379540v1

b.   "Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another" in violation of RSA 358-A:2, VII.

c.   "Advertising goods or services with intent not to sell them as advertised," in violation of RSA 358-A:2, IX.

105.    PJS violated the aforementioned statutory provisions by proposing to provide Mr. Bocelli with the type of jet that met with his specifications — the newer, more capacious Falcon 2000LX — and then providing another jet — the older, less accommodating Falcon 2000.

106.    Further, the conduct of PJS described in the foregoing paragraphs of this Complaint establish that PJS violated the catchall prohibition on unfair or deceptive acts or practices in the conduct of any trade or commerce within this State, in violation of RSA 358-A:2.

107.    PJS's violations of RSA 358-A:2 were knowing and willful.

108.    As a direct and proximate result of PJS's unfair or deceptive acts or practices, Mr. Bocelli has suffered substantial monetary damages, plus costs and attorneys' fees.

109.    Mr. Bocelli is entitled to treble his actual damages in light of PJS's willful and knowing violations of RSA 358-A:1, *et seq.*, plus the costs and attorneys' fees incurred by him in connection with this Action.

**Count VII**
**Restitution – Unjust Enrichment**

110.    Mr. Bocelli incorporates by reference and realleges the allegations set forth in the foregoing paragraphs as if fully set forth herein.

111.    Induced by PSJ's promise to provide him with the use of a Falcon 2000LX for the US domestic flights in his concert tour, Mr. Bocelli agreed to engage PJS's services, and paid it $569,800 in advance therefor.

112.     PJS reneged on its promise to provide Mr. Bocelli with use of the Falcon 2000 LX. Further, PJS cancelled jet services that it promised it would provide to Mr. Bocelli in December 2021, and upon which he had reasonably relied to his detriment, having paid PSJ in advance for those cancelled flights.

113.     PJS has been unjustly enriched by payments made by Mr. Bocelli for services that PJS improperly failed to provide.

114.     Under these circumstances, it would be unconscionable for PJS to retain Mr. Bocelli's payment for the flight services that it promised, but failed, to provide to him.

115.     Mr. Bocelli is entitled to restitution for payments made for the flights that PJS cancelled.


**Prayer for Relief**

WHEREFORE, Andrea Bocelli respectfully requests that this Honorable Court:

A.     Enter Judgment in favor of Andrea Bocelli on his claims against Private Jet Services Group, LLC;

B.     Award Andrea Bocelli damages, including, but not limited to, compensatory damages and enhanced compensatory damages;

C.     Award Andrea Bocelli treble damages pursuant to RSA chapter 358-A;

D.     Enter an Order requiring Private Jet Services Group, LLC to make restitution to Andrea Bocelli;

E.     Award Andrea Bocelli his costs and reasonable attorneys' fees, including, but not limited to, pursuant to RSA chapter 358-A; and

#15379540v1

F.      Grant such other and further relief as justice may require.

Respectfully submitted,

ANDREA BOCELLI

By his attorneys,

PIERCE ATWOOD LLP

Dated:  September 23, 2022              By:      /s/ Michele E. Kenney
                                                 Michele E. Kenney
                                                 NH Bar No. 19333
                                                 One New Hampshire Ave., Suite 350
                                                 Portsmouth, NH 03801
                                                 Telephone: (603) 433-6300
                                                 mkenney@pierceatwood.com

*Of Counsel:*

MCCABE COLEMAN VENTOSA & PATTERSON PLLC
Dean McGee, Esq.
Jennifer J. Clark, Esq.
42 Catharine Street
Poughkeepsie, New York 12601
Tel: (845) 379-2222
Dean@McCabeColeman.com
Jennifer@McCabeColeman.com